HITESH LALLU, and FAST
TRAX, INC.,

       Plaintiffs,

     v.                     Case No. 8:15-cv-02130-T-30EAJ

UNITED STATES OF AMERICA,

       Defendant.
_____/

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## WITH MEMORANDUM OF LAW

Pursuant to Rule 56, Fed. R. Civ. Pro., Defendant United States of America, on behalf of

the United States Department of Agriculture (USDA) and its agency, Food and Nutrition Serves

(FNS), moves for summary judgment on each of Plaintiff's claims on the grounds there are no

disputed issues of material facts and Defendant is entitled to judgment as a matter of law.

**MEMORANDUM IN SUPPORT**

### I.     Introduction

Plaintiffs Hitesh Lallu and Fast Trax, Inc. (hereinafter "Fast Trax"), bring this action

based upon their disqualification to participate in the Supplemental Nutrition Assistance Program

(SNAP), as codified in 7 U.S.C. §§ 2011-2036(c).  Fast Trax claims that the decision by FNS to

disqualify it from the SNAP program for trafficking should be set aside.

Fast Trax's claim that it was disqualified from SNAP arbitrarily and without regard to the

explanations it provided and has no basis in the facts of this case. The FNS conducted an

investigation into the store's Electronic Benefits Transfer (EBT) data from January 2015 through

April 2015 after FNS' "EBT ALERT" indicated that Fast Trax showed patterns consistent with possible trafficking.[1] On July 2, 2015, a charge letter was sent to Fast Trax's owner, Plaintiff Hitesh Lallu, detailing the patterns of suspect activity and informing them that they were being charged with trafficking and were being considered for permanent disqualification from SNAP. In a response by their attorney, Fast Trax failed to address each of the four patterns of activities identified in the charge letter. Instead, it asserted that the transactions referenced were caused by the store extending credit to customers whose EBT cards had no balance, who subsequently paid their debts when the cards were replenished by USDA.

FNS replied to Fast Trax, advising that the acceptance of SNAP benefits for items sold to a household on credit was a violation of SNAP regulation § 278.2(f). FNS invited Fast Trax to provide documentation to support the assertion that food items were purchased on credit at the store and to once again submit any information or evidence regarding the transactions outlined in the initial charging letter.

Having received no further response from Plaintiffs, FNS found that the trafficking violations cited in the charging letter had occurred and that Fast Trax was not entitled to a civil monetary penalty. As such, Plaintiffs were permanently disqualified from the SNAP program pursuant to §§ 278.6(c) and 278.6 (e)(1). This determination became final when Plaintiffs failed to pursue a timely appeal with the Administrative Review Division of USDA. *See* § 278.6(n).

Fast Trax disputes it engaged in trafficking as charged by FNS.[2] Because Fast Trax

---

[1] ALERT stands for the Anti-Fraud Locator Using Electronic Benefit Transfer Retailer Transactions, which is the computer system that FNS uses to analyze daily EBT data for patterns that may indicate fraudulent activity.

[2] Plaintiffs' complaint suggests that Fast Trax is amenable to a charge under §278.2(f), which prohibits a retail food store from accepting payments for items sold to a household on credit. *See* Doc. 1, pp. 7-8, ¶¶ 29-32. The penalty for such a violation is disqualification for a period of one year. §278.2(f). Trafficking, on the other hand, results in a permanent disqualification. §278.6(e). However, Fast Trax was never charged with credit sales, nor did it submit documentation of such activity, except for the unsworn statements of nine EBT cardholders that were identical and bare boned in content and were unsubstantiated and conclusory in nature.

cannot meet its burden to show by a preponderance of the evidence that the trafficking violations did not occur at the store, that the sanction imposed was arbitrary and capricious, and that there was a denial of due process, the Court should grant summary judgment to the United States.

## II.    STATEMENT OF FACTS

### A.    The Supplemental Nutrition Assistance Program

Congress designed the SNAP program to alleviate hunger and malnutrition among low-income households by providing aid for the purchase of staple food items in authorized stores. 7 U.S.C. §§ 2011, 2013(a).  FNS manages the SNAP program. 7 C.F.R. § 271.3. Decl. of Marchee Briant, Section Chief, Investigative Analysis Branch, FNS, attached hereto as Ex. A, p. 3, ¶ 4.

The SNAP program operates through the use of EBT cards issued to qualifying households. *Id*. The card is used in the same way as a debit card. A qualifying household's electronic account is credited monthly with the amount of benefits allocated. *Id*. Members of the household may then use the card to purchase food items eligible for purchase under the SNAP program at stores authorized to participate in the SNAP. *Id*. Food eligible for purchase under the SNAP program includes "any food or food product for home consumption except alcoholic beverages, tobacco and hot foods ready for immediate consumption . . ." 7 U.S.C. § 2012(k). *Id*.

Retail food stores must be certified to participate in the SNAP under regulations contained at 7 C.F.R. § 278.1.  Ex. A, pp. 3-4, ¶ 5.  Pursuant to the SNAP regulations, retail food stores may not accept EBT benefits as payment for ineligible items, including alcohol, cigarettes, tobacco, lottery tickets, pet foods, soaps, paper products, household supplies, vitamins, medicines, and hot food (prepared foods). *Id*. Any person who presents, or causes to be presented, any benefits for payment or redemption knowing the same to have been received, transferred, or used in any manner, in violation of the SNAP is subject to criminal or civil

penalties. *Id*. In addition to criminal penalties, the Act provides for the imposition of civil monetary penalties and the disqualification of any retail store authorized to participate in the SNAP that violates a provision of the statute or its implementing regulations. *Id*. In order to participate in the SNAP, a store's owner must certify that he or she is familiar with and will adhere to the Program's regulations. 7 U.S.C. § 2021(a); 7 C.F.R. 278.6(a). *Id*.

In a typical transaction, a member of a qualified household swipes their EBT card in a specially programmed point-of-sale device issued to the authorized retailer. Ex. A, p. 4, ¶ 6. Funds in the household's account are then electronically transferred to a bank account designated by the retailer in the amount of the SNAP purchase. Every purchase made with an EBT card is recorded in a national database maintained by the USDA. *Id*. The database electronically records every single EBT transaction made through data electronically transferred for every single entry (or "swipe") of an EBT card in each specially programed "point-of-sale" electronic device required to process EBT transactions. *Id*. Among other things, the database records the date, time, amount of each transaction and the store and household identification numbers involved in the transaction. *Id*. The EBT terminal generates a receipt for each transaction, and the balance remaining in the recipient's account for the month is displayed on the receipt. *Id*. The amount of the recipient's purchase is then electronically credited to the retailer's bank account. Id.

The USDA database can be queried to produce various reports, including "ALERT Reports," which identify specific EBT transactions within a given period of time that fall within certain patterns that are statistically unusual and which are indicative of transactions that are in violation of the SNAP. Ex. A, pp. 4-5, ¶ 7. The ALERT system records and tracks EBT transactions at every retail store participating in the SNAP in the United States. *Id*. By running an ALERT Report for a given month, or for any given period of time, USDA FNS field officers can

identify specific retailers and specific transactions in their region that fall within these patterns, as well as the specific data establishing the patterns. *Id*.

Irregular activity includes, but is not limited to: (1) an unusually high number of "same cents transactions" where the total dollar amount of the purchased items ends in "00," which is significant because the purchase of multiple items together rarely adds up to an even dollar equivalent; (2) the rapid, repetitive electronic EBT debits through multiple transactions of low dollar amounts conducted in order to avoid triggering FNS suspicion; (3) depleting the household's entire EBT allotment in a few transactions or within one or two days, which is inconsistent with normal shopping behavior, and (4) EBT debits in large dollar amounts, which is unlikely to occur in small retail stores that are not equipped with shopping baskets or carts, have limited eligible SNAP inventory for purchase, and limited counter space on which to process the purchase of a significant quantity of items during a single transaction. Ex. A, pp. 5-6, ¶ 8. If the electronic data suggests that a retail establishment is engaged in the trafficking of SNAP benefits[3], FNS engages in an investigation and conducts an in-store review. *Id*. Trafficking is expressly prohibited, and permanent disqualification from the Program is mandated by statute. 7 U.S.C. § 2021(a); 7 C.F.R. § 278.6. *Id*.

### B. Factual Background

Fast Trax is located at 1000 N. Combee Road in Lakeland, Florida and is owned by Mr. Hitesh Lallu. Ex. A, p. 2, ¶ 3; *see also* In re: Fast Trax, Inc., Administrative Record

---

[3] Trafficking is defined as the "buying or selling of coupons, ATP cards or other benefit instruments for cash or consideration other than eligible food." 7 C.F.R. § 271.2; 7 U.S.C. § 2021(b)(3)(B); *see also* Idias v. United States, 359 F.3d 695, 698 (4th Cir. 2004). The most common scheme is when a store redeems SNAP benefits in exchange for cash. *See* R&T Mini Mart, Inc. v. United States Dep't of Agr., FNS, 2008 WL 108592, *1 (E.D.Mich. Jan. 2, 2008).

(A.R.), attached hereto as Ex. B, at A.R. 85.[4]  It is classified as a Convenience Store with gross annual sales of $250,000 (2012) and average monthly food sales of $7,292 (2012). *Id.* The store's floor space is estimated at 700 square feet and the store is open from 7:00 a.m. through 9:00 p.m., seven days a week. *Id.*; Ex. B, at A.R. 86. Fast Trax has two cash registers, one Point of Sale (POS) device, no shopping baskets or shopping carts for its customers. *Id.* The store has optical scanning equipment  and the small service counter measures approximately 4 ft. by 3 ft. *Id.* Fast Trax sells what appears to be significant amount of ineligibles, including tobacco, gasoline, alcohol, lottery tickets, and other items such as household paper and cleaning products, health and beauty aids, and automotive products. *Id.*; Ex. B, at A.R. 87.

Fast Trax appeared on the EBT ALERT system as having met patterns consistent with possible EBT trafficking violations. Ex. A, p. 6, ¶ 9; Ex. B, at  A.R. 85. Donald Horne, Program Specialist, was assigned to perform an EBT case analysis. *Id.*; Ex. B, at A.R. 85-102. As a result, EBT SNAP transaction data for the months of January, February, March, and April 2015 were selected and analyzed. *Id.* In addition, an FNS contractor, Robert J. Guertin III, conducted an on-site visit on May 7, 2015, and a report was generated as part of the investigation. Ex. A, pp. 5-6, ¶ 9, Ex. B, at A.R. 51- 68.

The EBT transaction data indicated there was an unusual number of transactions in the same cents value as indicated in Attachment A. Ex. A, p. 6, ¶ 10; Ex. B, at A.R. 73-75; 91. During the review period, Fast Trax conducted 2,502 EBT transactions. Of these, there were 603 transactions of $9.00 or more; 109 of which ended in 00 cents, or 18.08%. *Id.* Disproportionate amounts of transactions that end in the same cents have an appearance of being contrived. *Id.* In

[4] Defendant is filing herewith a redacted copy of the A.R., but it will hand-deliver to the Court an unredacted copy of the AR as soon as practicable.

the absence of a compelling reason, such a finding is suggestive of trafficking. *Id*.

The EBT transaction data also demonstrated that multiple withdrawls were made from the account of single SNAP households within unusually short time frames as indicated in Attachment B2. Ex. A, pp. 6-7, ¶ 10; Ex. B, at A.R. 76-78; 92. During the three-month review period, 20 sets of violations performed by 13 different households were identified. *Id*. All of the multiple purchases from the identified households occurred within 24 hours. *Id.* This is a method that stores use to avoid detection by splitting up the transactions into smaller figures and is a potential indicator of trafficking. *Id.* Below is an example where a SNAP household return to Fast Trax several times on the same day to make small purchases to avoid trafficking detection. Note that the first three purchases in the morning were done within 3 minutes and 28 seconds while the two evening purchases were done within 55 seconds. The total amount of the multiple transactions was $322.59.

| | Terminal | Date | Time | Household | Amount | Method | Type |
|---|---|---|---|---|---|---|---|
| 120 | 02625894 | 01/13/2015 | 02:07:04 PM | | 89.90 | Swipe | Purchase |
| 121 | 02625894 | 01/13/2015 | 02:08:04 PM | | 32.90 | Swipe | Purchase |
| 122 | 02625894 | 01/13/2015 | 02:10:32 PM | | 58.88 | Swipe | Purchase |
| 123 | 02625894 | 01/13/2015 | 07:44:05 PM | | 56.91 | Swipe | Purchase |
| 124 | 02625894 | 01/13/2015 | 07:45:00 PM | | 84.00 | Swipe | Purchase |
| *Total Violations: 5* | | *Total Time: 05:37:56* | | | *Amount: $322.59* | | |

The review of the EBT transactions between January and April 2015 also demonstrated instances where the majority of the recipient's SNAP balances were being depleted in an unusually short period of time as shown in Attachment C. Ex. A, p. 7, ¶ 12; Ex. B, at A.R. 79-80; 92-93. There were 16 suspicious sets of transactions involving 12 households. *Id*. Depleting a household's monthly allotment in a few transactions or in one or two days is inconsistent with normal shopping behavior and connotes trafficking. *Id.* Following are examples of this type of activity:

| | Terminal | Date | Time | Household | Amount | End Balance |
|---|---|---|---|---|---|---|
| 160 | 02625894 | 01/06/2015 | 09:58:33 AM | | 1.00 | 355.84 |
| 161 | 02625894 | 01/06/2015 | 10:54:59 AM | | 352.41 | 3.43 |
| Total Violations: 2 | | Total Time: 00:56:26 | | | Amount: $353.41 | |

| | Terminal | Date | Time | Household | Amount | End Balance |
|---|---|---|---|---|---|---|
| 167 | 02625894 | 04/23/2015 | 07:47:04 PM | | 10.28 | 177.31 |
| 168 | 02625894 | 04/23/2015 | 07:48:12 PM | | 177.31 | 0.00 |
| Total Violations: 2 | | Total Time: 00:01:08 | | | Amount: $187.59 | |

| | Terminal | Date | Time | Household | Amount | End Balance |
|---|---|---|---|---|---|---|
| 166 | 02625894 | 01/07/2015 | 12:02:44 PM | | 190.00 | 4.00 |
| Total Violations: 1 | | Total Time: 00:00:00 | | | Amount: $190.00 | |

Finally, a review of the EBT transactions between January and April 2015 demonstrated instances where excessively large purchase transactions were being made from recipient accounts as indicated in Attachment F. Ex. A, pp. 7-8, ¶ 13; Ex. B, A.R. 81-84; 93. The average convenience store transaction for Florida during this period was $7.29. *Id*. Yet, the largest purchase at Fast Trax in this period was $400.00. Out of 2,502 EBT transactions in this period, 194 had an amount over $29.00, which is 300% higher than the average purchase amount for this type category of store. *Id*. Additionally, 57 of the 194 violations identified in Attachment F, were at or over $100. These large purchases are indicative of trafficking because Fast Trax's eligible food stock and small size do not support consistently large purchases greater than $29.00, let alone transactions for $200 or $300. *Id*. The following is an example of excessively large purchase transactions:

| | Terminal | Date | Time | Household | Amount | Method |
|---|---|---|---|---|---|---|
| 190 | 02625894 | 01/23/2015 | 05:58:03 PM | | 400.00 | Swipe |
| 191 | 02625894 | 01/06/2015 | 10:54:59 AM | | 352.41 | Swipe |
| 192 | 02625894 | 03/09/2015 | 11:00:59 AM | | 300.00 | Swipe |
| 193 | 02625894 | 03/13/2015 | 12:47:49 PM | | 225.19 | Swipe |
| 194 | 02625894 | 02/25/2015 | 12:07:55 PM | | 215.71 | Swipe |
| 195 | 02625894 | 01/29/2015 | 01:04:47 PM | | 208.97 | Swipe |
| 196 | 02625894 | 03/02/2015 | 05:17:24 PM | | 208.27 | Swipe |
| 197 | 02625894 | 04/02/2015 | 01:12:51 PM | | 205.32 | Swipe |
| 198 | 02625894 | 04/03/2015 | 06:25:51 PM | | 204.47 | Swipe |
| 199 | 02625894 | 04/09/2015 | 11:28:03 AM | | 201.59 | Swipe |
| 200 | 02625894 | 04/08/2015 | 11:45:48 AM | | 200.75 | Swipe |
| 201 | 02625894 | 01/09/2015 | 11:44:14 AM | | 200.00 | Swipe |
| 202 | 02625894 | 04/30/2015 | 11:49:01 AM | | 199.98 | Swipe |
| 203 | 02625894 | 04/03/2015 | 08:37:04 PM | | 199.91 | Swipe |
| 204 | 02625894 | 04/08/2015 | 06:20:45 PM | | 199.91 | Swipe |
| 205 | 02625894 | 01/06/2015 | 02:07:08 PM | | 199.21 | Swipe |

A comparison of stores was undertaken as part of the EBT case analysis. There are 20 stores within two miles of Fast Trax indicating there is no lack of option for SNAP recipients wishing to purchase eligible food at other authorized retail locations. Ex. A, p. 9, ¶ 14; Ex. B, at A.R. 94. Included in the 20 food stores is one supermarket that offers a very large selection of food items at much cheaper prices than your typical convenient stores. *Id*. If the area of patronage is extended to three miles, four supermarkets are available for shopping to SNAP recipients. *Id*. With such access to retail food stores, there is no need for SNAP recipients to conduct the food purchases identified in the suspicious EBT transaction patterns. *Id*.

Additionally, the average transaction at Fast Trax is $12.15. This exceeds the average transaction in a convenience store in the State of Florida, which is $7.29. Ex. A, pp. 9-10, ¶ 15; Ex. B, at A.R. 95. The Total Transaction Dollar Amount for Fast Trax is almost three time that of an average convenience store ($30,399.57 vs. $11,570.11). *Id*. Finally, in a comparison of the number of transactions within a specified dollar range (minimum $10.00; maximum $400.00), Fast Trax exceeds in all ranges the average purchase for a convenience store in Florida. *Id*. This transactional activity is extremely unusual and is a strong indication of trafficking. *Id*.

An Individual Household Analysis was performed for the period in question. On January 9, 2015 Household *5101 made a purchase at Fast Trax for $200 followed by three transactions at supermarkets and superstores for $499.27. Ex. A, p. 10, ¶ 16; Ex. B, at A.R. 99. After skipping February, Household *5101 made two purchases totaling $381.88 at a supermarket on March 9, 2015. *Id*. *Twelve minutes later*, this Household returned to Fast Trax and made a purchase of $300. On April 9, 2015, Household *5101 returned to Fast Trax and made a purchase of $99.93, just under $100 and later that day made three transaction at supermarkets and superstores totaling $415.05. *Id*. Clearly, this Household purchases its groceries at supermarkets and superstores, yet on the very same day, makes large purchases at Fast Trax as well. *Id*. This purchasing pattern is more indicative of trafficking at Fast Trax, than purchasing eligible foods under the SNAP program. *Id*.

The USDA sent a letter dated On July 7, 2015 to Plaintiffs Hitesh Lallu and Fast Trax charging them of "trafficking," as defined in § 271.2 of the SNAP regulations (the "Charge Letter") and enclosed a copy of the records of the suspect EBT transactions, as reflected in Attachments A, B2, C, and F. Ex. A, p. 10, ¶ 17; Ex. B, at A.R. 103-117. The Charge Letter was delivered on July 9, 2015. *Id*.; Ex. B, at A.R.118-120.

The Charge Letter warned Plaintiffs that if, after considering additional evidence, FNS determined that Plaintiffs committed these violations, Plaintiffs would be permanently disqualified from the SNAP program as provided in §278.6(e). Ex. A, p. 11, ¶ 18; Ex. B, at A.R. 103. The letter further advised that Plaintiffs could qualify for a civil monetary penalty (CMP) under §278.6(i), should the criteria be met, in lieu of disqualification. Ex. A, p. 11, ¶ 19; Ex. B, at A.R. 103.   However, to be considered for a

CMP, Plaintiffs were required to make an application within 10 days of the receipt of the Charging Letter. *Id*.; Ex. B, at A.R.103-104.

In a letter dated July 17, 2015, Plaintiffs responded to the FNS Charging Letter through Attorney Lee Adam Cohen. Ex. A, pp. 11-12, ¶ 20; Ex. B, at A.R. 122-123. This correspondence did not specifically address the transaction or the four categories of violations identified in the attachments to the Charging Letter reflected in the EBT transactions. *Id*. Rather, Mr. Lallu attributed the EBT transactions to Fast Trax extending credit to customers who did not have a balance on their EBT cards. *Id*. Once the EBT cards were replenished, his customers purportedly paid off their tabs. *Id*. Plaintiffs attached nine (9) identical, unsworn statements from customers who purportedly made credit purchases at Fast Trax "over the years" without any particularity and specificity the subject credit transactions or payments, much less proof thereof. *Id*.; Ex. B, at A.R. 124-132.

On July 17, 2015, FNS spoke with Attorney Cohen and sent a letter to him at Fast Trax advising that the acceptance of SNAP benefits as payment for items sold to customers on credit was a violation of SNAP regulation §278.2(f), which mandated a term disqualification of one year. Ex. A, p. 12, ¶ 21; Ex. B, at A.R. 133. The letter requested Fast Trax to provide documentation to support that food items were purchased on credit, including the specific accounts or ledgers along with the corresponding dates and amounts. *Id*. Additionally, FNS repeated its request for documentation and evidence regarding the charges outlined in the letter of July 7, 2015, which Fast Trax had failed to address. *Id*.

FNS did not receive a response from either Mr. Hitesh, Fast Trax or Attorney Cohen,

within 10 days of the mailing of the July 17, 2015 agency letter. Plaintiffs produced no other information or evidence. Ex. A, p. 12, ¶ 22.

Program Analyst Donald Horne prepared a Retailer Reply and Case Sanction Recommendation based on the written and oral communications with Attorney Cohen on July 17, 2015. Ex. A, pp. 12-13, ¶ 23; Ex. B, at A.R. 138-139. It was noted that Mr. Lallu was given an opportunity to present proof that credit had been extended to customers, but nothing was received to substantiate the claim. *Id.* Moreover, of the nine (9) unsworn, bare bone statements that were previously produced, eight individuals were identified as SNAP recipients and only five (5) were involved in just 22 of the 253(?) EBT transactions listed in the July 7, 2015 Charge Letter. A.R. 138. As such, the payment on credit as an explanation for the EBT transactions was rejected for lack of proof. *Id.*

Based on the four types of EBT transactions listed in the Charge Letter, the lack of a high dollar inventory at Fast Trax, the high number of competitive stores in the area, the shopping patterns of households, and the high number of unusual transactions and transaction patterns at Fast Trax, a charge of trafficking and permanent disqualification was recommended. Ex. A, p.13, ¶ 24; Ex. B, at A.R.139.

On August 13, 2015, USDA sent Plaintiffs its decision letter determining that, based on the evidence available, the violations cited in the Charge Letter did occur. Ex. A, p.13, ¶ 25; Ex. B, at A.R. 141-142. Because Plaintiffs also timely failed to request a Civil Monetary Penalty (CMP) or submit evidence to USDA demonstrating the store had an effective program to prevent trafficking violations, they were not eligible for the CMP. *Id.* As a result, the letter informed Plaintiffs that they were permanently disqualified from participating in SNAP. *Id.*

### III.    STANDARD OF REVIEW

### A.    Standard for Summary Judgment

The granting of summary judgment is appropriate when the pleadings, depositions, and affidavits submitted by the parties indicate no genuine issue of material fact and show that the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed. R. Civ. P. A court must view the evidence and any inferences that may be drawn from that evidence in light most favorable to the non-moving party. See Mercantile Bank & Trust Co. v. Fidelity & Deposit Co., 750 F. 2d 838, 841 (11th Cir.1985).

The party seeking summary judgment must first identify grounds demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Such a showing shifts to the non-moving party the burden to go beyond the pleadings and present affirmative evidence showing that a genuine issue of material fact exists. *See* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." United States v. Gilbert, 920 F. 2d 878, 883 (11th Cir. 1991) (citations omitted), and a mere scintilla of evidence supporting the non-moving party's position will not fulfill this burden. *See* Walker v. Darby, 911 F. 2d 1573, 1577 (11th Cir.1990).

It is well settled that summary judgment is appropriate in cases brought pursuant to 7 U.S.C. § 2023(a)(13). *See* Fells v. United States, 627 F.3d 1250, 1254 (7th Cir. 2010); McClain's Market v. United States, 214 Fed. Appx 502, 506 (6th Cir. 2006); Idias v. United States, 359 F.3d 695, 698-99 (4th Cir. 2004); Sky Grocery, LLC v. U.S. Dep't of Agriculture, 2017 WL 1054484, at *6 (D. Conn. 2017); Savera Super Store LLC v. United States, 2016 WL 55274, at *1 (D.N.H. 2016); Duchimaza v. United States, 2016 WL 5799295, at *5 (D. Conn. 2016); Nadia Int'l Market v. United States, 2015 WL 7854290, at *4 (D. Vt. 2015), *appeal dismissed*

(2d Cir. 16-3640, July 28, 2016).

In the context of review under 7 U.S.C. § 2023, courts recognize that FNS's decision to disqualify a store may be based on an investigation, redemption data and EBT transaction reports. *See* Tony's Pantry Mart, Inc. v. United States, 2017 WL 514184, *2 (N.D.Ill. 2017); Nadia, 2015 WL 7854290, at *5; 109 Merrick Deli Corp. v. United States, 2014 WL 6891944, *4 (E.D.N.Y. 2014). Courts regularly affirm the disqualification of a retail store by FNS from the SNAP program based upon the statistical analysis of EBT transaction data. *See, e.g.,* A Touch of Merengue, LLC – The Atom v. United States, 2014 WL 6609478, at *2 (D.R.I. 2014) (rapid and repetitive transactions and large volume of high dollar transactions); Saudabad Convenience, Inc. v. United States Department of Agriculture, 2014 WL 611194, at *2 (D.R.I. 2014) (high-dollar transactions, depletion of monthly benefits in one transaction, multiple transactions in short time-frames); Arias v. United States, 2014 WL 5004409, at *2 (S.D.N.Y. 2014) (multiple transactions in unusually short time and excessively large transactions); Narin Market, LLC, 2014 WL 1820447, at *2 (rapid and repetitive transactions, large volume of high dollar transactions, depletion of monthly benefits in one transaction); RocklandConvenience Store v. United States, 2011 WL 5120410, *3 (D.N.H. 2011)(inordinate number of EBT transactions in exact dollar amounts, multiple transactions within short time periods, large purchases exceeding purchase amounts for similarly situated stores); *see also* Duchimaza, 2016 WL 5799295, at *8 ("Government may permanently disqualify a retailer on the basis of EBT data").

### B.    Judicial Review of Agency Decision

The standard for judicial review of the USDA's disqualification of a store from the SNAP "shall be a trial de novo by the court in which the court shall determine the validity of the questioned administrative action in issue." 7 U.S.C. § 2023(a)(15). By providing for a trial *de*

*novo*, "Congress intended nothing more than the district court would not be bound by the administrative record." Redmond v. United States, 507 F.2d 1007, 1011 (5th Cir. 1975); Broad St. Food Market, Inc. v. United States, 720 F.2d 217, 220-221 (1st Cir. 1983); Hajifarah v. United States, 779 F. Supp. 2d 191, 199 (D. Me. 2011).

The trial *de novo* provision does not waive the basic requirements of either the Federal Rules of Civil Procedure or the local rules of the district court. A plaintiff seeking review of an FNS disqualification does not have an automatic entitlement to a trial *de novo* without first satisfying the burden of showing a genuine issue of material fact. *See* McClain's, 214 Fed. Appx at 504; Ganesh v. United States, 2015 WL 6871644, at *2 (E.D. Ky. 2015); A Touch of Merengue, 2014 WL 6609478, at *2.

A store owner seeking judicial review bears the burden of showing, by a preponderance of the evidence, that the Agency's decision was invalid and that no violation occurred. *See* Redmond, 507 F.2d at 1012; Fells, 627 F.3d at 1253; A Touch of Merengue, 2014 WL 6609478, at *2; Narin, 2014 WL 1820447, at *2; Rockland, 2011 WL 5120410, at *8. "'[T]o defeat summary judgment, Plaintiffs must submit evidence from which a reasonable juror could conclude that the agency's determination is invalid with respect to *each cited instance* of trafficking.'" Sky Grocery,LLC, 2017 WL 1054484, at *6 (quoting Duchimaza, 2016 WL 5799295, at *7) (emphasis added); *see also* Young Choi Inc. v. United States, 639 F. Supp. 2d 1169, 1179 (D. Haw. 2009) ("In order to preclude summary judgment, Plaintiff must raise material issues of fact as to *each of the violations* charged against [the store].") (emphasis added); Dollar Plus Food Mart LLC, v. United States, 2015 WL 11090898, *5 (D.Ariz.2015).

If the Court finds that the Agency's determination was correct, review of the sanction that the Agency imposed is limited to the deferential standard of whether that sanction was arbitrary

or capricious. *See* Affum v. United States, 566 F.3d 1150, 1161 (D.C. Cir. 2009). The Agency's decision must be upheld unless the Court determines that the sanction was "unwarranted in law or without justification in fact." *See* Young Choi, 639 F. Supp. at 1172. The agency action is accorded a "presumption of validity," Redmond, 507 F.2d at 1012, and if the agency has followed its own guidelines, "'the reviewing court may not overturn the decision as arbitrary and capricious.'" Lugo v. United States, 2009 WL 928136, at *2 (S.D.N.Y. 2009). "Whether the imposition of a penalty by the FNS [is] arbitrary or capricious is a matter of law appropriately determined on a motion for summary judgment." *Id.*, at *3.

### IV. ARGUMENT

**A.     There is Substantial Evidence Supporting the Permanent Disqualification of Plaintiffs Hitesh Lallu and Fast Trax**

The EBT data provides substantial evidence that Plaintiffs violated the law governing SNAP by trafficking in SNAP benefits. The Agency's conclusion that Plaintiffs engaged in trafficking is supported by a preponderance of the evidence in the administrative record.

As discussed above, FNS identified four categories of suspicious transactions that were indicative of trafficking. Ex. B, at A.R. 103-117. This was predicated on an EBT case analysis performed by FNS, along with an onsite retail store inspection. Ex. A, p. 6, ¶ 9; Ex. B, at A.R. 85-102; 51-68. This detailed information in addition to the lack of any specific responses by Plaintiff, served as the basis for a finding of trafficking in the FNS determination letter of August 13, 2015. Ex. A, p. 13, ¶ 25; Ex. B, at A.R. 141-142. In the instant case, FNS followed agency statutes and regulations in its determination because it was based on "facts established through on-site investigations, inconsistent redemption data, or evidence established through a transaction report under an electronic benefit transfer system." 7 U.S.C. § 2021(a) (2) and 7

C.F.R. § 278.6(a). *See also* <u>Idias</u>, 359 F.3d at 698 and <u>Young Choi, Inc.</u>, 639 F. Supp. 2d at 1178.

To survive summary judgment, a plaintiff in a Food Stamp Program disqualification case must raise material issues of fact as to *each* alleged violation. <u>McClain's Market v. United States</u>, 214 Fed.Appx. 502, 505 (6th Cir. Dec. 20, 2006)(unreported), *citing* Kahin v. United States, 101 F.Supp.2d 1299, 1303 (S.D.Ca.2000)(emphasis added). At no time did Plaintiffs raise any material issues of fact as to any of the four patterns identified by the EBT transaction data.

       1.      <u>Unusual Number of Transactions Ending in Same Cents Values Evidences Trafficking</u>

The data for January through April 2015 identified 603 EBT transactions of $9.00 or more, and 109, or 18.08% of the transactions, ended in "same cents values" or "$.00".  Ex. A, p. 6, ¶ 10; Ex. B, at A.R. 73-75; 91. Numerous "same-cents-value" transactions are suspect for the simple reason that, statistically, the tabulation of random item prices in different sale transactions should result in a fairly random distribution of totals. However, the analysis of Fast Trax revealed that the same-cents transactions occurred significantly more often. In the absence of a compelling reason for each transaction, transactions ending in the same cents are suggestive of trafficking. *Id*. *See also* <u>African Store v. United States</u>, 2008 WL 782731, *5 (E.D.Mo. Mar. 20, 2008); <u>Kahin v. United States</u>, 101 F. Supp. 2d 1299, 1300 (S.D.Ca. 2000).

       2.      <u>Multiple Transactions Made from Individual benefit Accounts in Unusually Short Periods of Time</u>

FNS identified 20 suspicious sets of transactions involving 13 different households where multiple withdrawals where made from their accounts in unusually short time frames, ranging from less than one minute to 24 hours, totaling as much as $404.38. Ex. A, pp. 6-7, ¶ 11; Ex. B, at A.R. 76-78; 92. Stores try to avoid detection by splitting up larger transaction into smaller ones, and this is a useful indicator of trafficking. *Id*.  One example included a household that

made five purchases at Fast Trax the same day. Three purchases in the morning were performed in 3 minutes and 28 seconds while two transactions in the evening were completed within 55 seconds.  The amount of the five transactions were $89.90, $32.90, $58.88, $56.91, and $84.00. The sum total was $322.59.  This evidence supports FNS's position that these types of transactions are indicative of trafficking and not for the purchase of eligible foods. *See* <u>Alkabash v. United States</u>, 733 F. Supp.2d 929, 937-38 (W.D. Tenn. 2010)(relying on multiple EBT transactions within short period of time, for excessive dollar amounts); <u>Young Choi</u>, 639 F. Supp.2d at 1196 (relying on multiple transactions in short period, high dollar values).

      3.      <u>Individual Recipient Benefits Exhausted in Unusually Short Periods of Time</u>

FNS also identified a pattern in the EBT transactions of Fast Trax which indicated that recipient's SNAP balances were being depleted in an unusually short time frame. Ex. A, p. 7, ¶ 12; Ex. B, at A.R. 79-80; 92-93. There were 16 suspicious sets of transactions involving 12 households. *Id*.  Depleting a household's monthly allotment in a few transactions or over a period of a couple of days is inconsistent with normal shopping behavior. *Id*.

Given a small convenience store's limited stock, it is unlikely that a household would deplete the majority of their benefits at a store such as Fast Trax. *Id*. Here, Plaintiffs have failed to provide an explanation for any of the depletion transactions identified in the EBT data.  As such, this alone serves as a basis to warrant summary judgment on behalf of the government. *See* <u>Young Choi, Inc.</u>, 639 F. Supp.2d at 1185 (Expert fails to explain depletion transactions warranting summary judgment for government).

      4.      <u>Excessively Large Purchases Made from Recipient Accounts</u>

The fourth pattern indicative of trafficking is the disproportionately high number of large dollar transactions that occurred at Fast Trax. Ex. A, pp. 7-8, ¶ 13; Ex. B, at A.R. 81-84; 93. The

average convenience store transaction for Florida during this period was $7.29. *Id*. Yet, the largest purchase at Fast Trax in this period was $400.00. Out of 2,502 EBT transactions in this period, 194 had an amount over $29.00, which is 300% higher than the average purchase amount for a convenience store. *Id*. Additionally, 57 of the 194 violations identified were at or over $100. These large purchases are indicative of trafficking because Fast Trax's eligible food stock and small size do not support consistent purchases greater than $29.00, let alone transactions for $200 or $300. *Id*. Courts have affirmed the disqualification of retail stores where excessively large EBT transactions have occurred. McClain's Market v. United States, 214 Fed.Appx. 502, 504 (6th Cir. Dec. 20, 2006)(unreported); Young Choi, Inc., 639 F. Supp.2d at 1169 (relying on EBT data, including high dollar values).

5.   Plaintiffs Failed to Satisfy the Criteria for a Civil Monetary Penalty

The one limited exception to permanent disqualification for a trafficking offense provides the USDA discretion to impose a civil monetary penalty ("CMP") in lieu of disqualification if it determines by "substantial evidence" that a store had "an effective policy and program in effect to prevent violations." 7 C.F.R. § 278.6(e)(1)(i); 7 U.S.C. § 2021(b)(3)(B). The CMP is not an issue here. Such a request must be made within ten days of receiving the Charge Letter and must include the necessary evidence to establish eligibility. The failure to make a timely request for a CMP bars a store from such consideration. *See* 7 C.F.R. § 278.6(b)(2)(iii). Plaintiffs were advised in the Charge Letter of the process to apply for the CMP and the eligibility criteria. Ex. A, p. 13, ¶25; Ex. B, at A.R. 141-142. Plaintiffs never requested consideration for a CMP. *Id*.

B.   **The Sanction of Permanent Disqualification was Appropriate**

Plaintiffs allege that they did not engage in trafficking and that the evidence, at most, supports a violation based on the issuance of credit to SNAP recipients. Doc. 1, pp. 7-8,

¶¶ 29-33. This, Plaintiffs argue, would constitute a violation of 7 C.F.R. § 278.2(f) and would impose a penalty of disqualification for only one year. However, Plaintiffs have not been accused of issuing credit to SNAP recipients. Ex. B, at A.R. 103-105, 122-123). The only violations identified by FNS were transactional data patterns evidencing trafficking.

This notwithstanding, the only documentation produced by Plaintiffs in support of their "proffer" consisted of nine (9) unsworn statements of individuals who purportedly were customers of Fast Trax "for several years". Ex. B, at A.R. 124-132. These unsworn statements were identical in nature save for the name of each customer. More importantly, the bare bone statements are unsupported by any facts to indicate the date the customer's accounts were depleted, when the "open tabs" of credit were created with the corresponding amounts, and when those accounts were paid. Nor did Fast Trax produce any ledgers, tabs, or accounts related to the extension of credit pertaining to the customers who signed the unsworn statements.

Having produced unsubstantiated statements, FNS sought to obtain proof from Fast Trax that it was extending credit to SNAP recipients in violation of § 278.2(f) by specifically requesting documentation of specific accounts with corresponding dates and amounts. Ex. B, at A.R. 133. However, Plaintiffs never responded to the FNS letter of July 17, 2015 and never provided any tangible proof of credit sales at Fast Trax. Having failed to provide proof, FNS properly rejected Plaintiffs' claim that payment on credit accounts caused the transactions identified in the Charge Letter of July 7, 2015, and that instead, Fast Trax had engaged in trafficking. Ex. B, at A.R. 138-139. For this reason, the agency determination letter of August 13, 2015 found that Fast Trax engaged in trafficking and permanently suspended Plaintiffs from the SNAP program.

Here, Plaintiffs' complaint asserts that the only evidence supporting a violation on their

part was in relation to the issuance of credit to its SNAP customers. Doc. 1, pp. 7-8, ¶ 31. However, like in the administrative proceedings, Plaintiffs' allegations are merely colorable and fail to articulate any set of facts that are probative to the claim that Fast Trax engaged in extending credit to its customers rather than in trafficking. It is settled that a court will not accept conclusory allegations as facts in consideration of a motion for summary judgment. Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009); *see also* Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000)("[t]his court has consistently held that conclusory allegations without specific supporting facts have no probative value"); Fullman v. Graddick, 739 F.2d 553, 556-57 (11th Cir.1984)(a plaintiff's mere verification of conclusory allegations is not sufficient to oppose a motion for summary judgment).

The only proffered evidence indicating Fast Trax was involved in extending credit to its SNAP customers are the very documents that Fast Trax submitted to FNS in the administrative proceedings.  In short, Plaintiffs continue to rely on unsubstantiated and conclusory statements to establish Fast Trax engaged in credit sales with its customers.  Moreover, the unsworn statements of the Fast Trax's customers cannot be considered at the summary judgment stage. These nine (9) statements are neither sworn nor in compliance with 28 U.S.C. § 1746 and cannot be considered.  Estrella v. Ltd Financial Services, LP, 2015 WL 6742062, *3 (M.D.Fla. Nov. 2, 2015) *citing* Dudley v. City of Monroeville, Ala., 446 Fed.Appx. 204, 207 (11th Cir. 2011)("Unsworn statements do not meet the requirements of Rule 56, so the district court could not – and properly did not – rely on the content of the [unsworn] statement."). Since these documents cannot be considered, Plaintiffs are unable to assert or establish that Fast Trax engaged in credit sales with SNAP customers.

Having determined that Fast Trax engaged in trafficking, the only remaining issue is

whether the sanction imposed, permanent disqualification, was appropriate. Bruno's, Inc., v. United States, 624 F.2d 592, 594 (5th Cir.1980) ("To be 'valid' a sanction must not be arbitrary and capricious, and a sanction is arbitrary and capricious if it is unwarranted in law or without justification in law.") *citing* Goodman v. United States, 518 F.2d 505, 511(5th Cir. 1975); *see also* Yousef v. United States, 647 F.Supp. 127, 131 (M.D.Fla.1986).

That question is answered in the affirmative. Permanent disqualification is required under the statute, unless there is a request and showing that an effective compliance program was in place for which a civil money penalty will be imposed in lieu of disqualification. 7 U.S.C. § 2021(b)(3)(B). Moreover, "a store that is caught trafficking in food stamps *even one time* must be permanently disqualified from the Food Stamp Program, unless the Secretary of Agriculture determines that the store had in place an effective antitrafficking policy." Idias v. United States, 359 F.3d 695, 697 (4th Cir. 2004) (emphasis added); Kahin v. United States, 101 F. Supp. 2d 1299, 1304 (S.D.Ca. 2000); *see also* 7 C.F.R. § 278.6(e)(1) ("The FNS regional office *shall* . . . disqualify a firm permanently if . . . personnel of the firm have trafficked as defined in § 271.2") (emphasis added).

Here, FNS has demonstrated that its conclusion that Fast Trax engaged in trafficking was supported by substantial evidence as reflected in the Administrative Record. Moreover, FNS expressly followed its own statutes and regulations in determining that Fast Trax should be permanently disqualified from SNAP. Far from offering substantial evidence, Plaintiffs' proof was patently deficient, having failed to address each of the violations identified by the FNS. As such, Plaintiffs cannot prove by a preponderance of the evidence that the violations did not occur. *See* Redmond, 507 F.2d at 1012.

Accordingly, there is no merit to Plaintiffs' claim that the FNS's decision was arbitrary

and capricious. Permanent disqualification was the only appropriate sanction.

### C.    Plaintiffs were Afforded Due Process

Due process is also evident here. "The test for a substantive due process claim is whether there is a fundamental right at stake, and if not, whether there exists a rational basis for the deprivation." United States v. Hughes, 632 F.3d 956, 962 (6th Cir. 2011). "Substantive due process claims not involving a fundamental right are reviewed under the rational basis test." TRM, Inc. v. United States, 52 F.3d 941, 945 (11th Cir. 1995). "The standard for evaluating substantive due process challenges to social and economic legislation is virtually identical to the "rational relationship" test for evaluating equal protection claims….[A]ny plausible reason supporting Congress' action in enacting the suspect legislation satisfies the rational basis test." In re Woods, 866 F.2d 1367, 1371 (11th Cir. 1989). Under the rational basis standard, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440 (1985).

The statute and regulations governing the disqualification of stores trafficking in SNAP benefits are rationally related to the Government purpose of reducing or eliminating fraud in SNAP, and are not violations of Plaintiff's substantive due process rights. Numerous courts have rejected substantive due process challenges to the SNAP disqualification scheme. *See* Traficanti v. United States, 227 F.3d 170, 174-75 (4th Cir. 2000) (holding that SNAP's "strict liability regime is rationally related to the government's interest in preventing fraud"); Kim v. United States, 121 F. 3d 1269,1275 (9th Cir.1997) (holding that permanent disqualification of "innocent store owner" did not violate substantive due process); TRM, Inc. v. United States, 52 F.3d 941, 947 (11th Cir.1995) ("Congress could rationally have concluded that a store owner who risks

losing the ability to accept food stamps is more likely to be vigilant and vigorous in the prevention of employee trafficking.").

Plaintiffs were likewise afforded procedural due process. Procedural due process requires notice and a meaningful opportunity to be heard. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950). Throughout the administrative review process, the government gave Plaintiffs notice and an opportunity to be heard. This is evident from the record of the administrative proceedings and the correspondence between the parties. This process is initiated from the time a charge letter is sent by FNS to the retail firm and a response is received in 10 days from the firm. The appropriate FNS office then reviews the relevant information, including the store's submissions, if any, and determines the appropriate penalty. If the store is dissatisfied with the decision, it may appeal the decision to the Administrative Review Branch. An opportunity exists to make an appearance at this stage and to also to provide additional submissions on the matter. The agency thereafter renders a final agency decision on the matter. Here, FNS regulations provide multiple level of review once a charge letter is sent out.

Furthermore, the trial *de novo* initiated by Plaintiffs' Complaint provides them with due process here sufficient to remedy any hypothetical lack of procedural due process rights during the administrative review process. See TRM, Inc. v. United States, 52 F.3d 941, 944 (11th Cir.1995) (we need not decide whether the administrative review process alone sufficiently safeguards [plaintiff's] right to be heard because the statute the statute provides [plaintiff] with a full hearing *de novo* in district court). *See also* Ibrahim v. United States, 834 F.2d 52, 53–54 (2nd Cir.1987)(citations omitted)("The trial *de novo* provision clearly afforded full procedural due process"); Kim v. United States, 121 F. 3d 1269, 1274-75 (9th Cir. 1997)(*de novo* trial cures any denial of due process); Haskell v. United States Dep't of Agriculture, 930 F.2d 816, 820 (10th Cir.1991)("[O]nce a participant seeks review *de novo*, the adequacy of the administrative process

as an abstract matter is no longer important.")(citation omitted).

There was no due process violation here. Plaintiffs' claims, to the contrary, have no support in the record or in law.

## V.    CONCLUSION

There is no genuine dispute as to any material fact. There is substantial evidence that Plaintiffs' violated SNAP by engaging in trafficking and was appropriately permanently disqualified from the Program. Plaintiffs' proof was also patently deficient, having failed to address each of the four violations identified in the FNS charging letter. Plaintiffs cannot establish by a preponderance of the evidence that the violations that were charged did not occur. Finally, there was no due process violation.

Respectfully Submitted,

MARIA CHAPA LOPEZ
United States Attorney

*/s/ Roberto H. Rodriguez, Jr.*
ROBERTO H. RODRIGUEZ, JR.
Assistant United States Attorney
Identifying No. USA074
400 N. Tampa St., Ste. 3200
Tampa, Florida 33602
Roberto.Rodriguez@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send notice electronically to:

Andrew Z. Tapp, Esq.
*Counsel for Plaintiff*

*s/ E. Kenneth Stegeby*
E. KENNETH STEGEBY
Assistant United States Attorney